UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| MONCELL COLLINS | CIVIL ACTION |
| VERSUS | NO: 23-5992 |
| UNITED STATES OF AMERICA | SECTION: "A" (2) |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This case was tried to the Court sitting without a jury on April 27-29, 2026. The matter was taken under advisement on August 17, 2026, upon the filing of the parties' post-trial memoranda. Having considered the testimony and evidence at trial, the deposition testimony of Dr. G. Randolph Rice taken on May 13, 2026, the arguments of counsel, and the applicable law, the Court now enters the following Findings of Fact and Conclusions of Law in accordance with Federal Rule of Civil Procedure 52(a). To the extent that any finding of fact may be construed as a conclusion of law, the Court hereby adopts it as such. To the extent that any conclusion of law constitutes a finding of fact, the Court adopts it as such.

## I. FINDINGS OF FACT

This is an action under the Federal Tort Claims Act, 28 U.S.C. §§ 2671, *et seq.*, ("FTCA") resulting from a collision between a vehicle being driven by a United States Coast Guard ("USCG") employee, Chief Petty Officer George P. Harmansky, and a vehicle in which the plaintiff, Mr. Moncell Collins, was a passenger.

The two-car collision occurred on April 14, 2021, at approximately 1:37 a.m. in

Port Fourchon, Louisiana. Harmansky was driving a 2021 GMC Yukon XL that was rented from Enterprise Rental Car Company. At the time of the April 14, 2021 accident, Harmansky had rented this vehicle from Enterprise (using a government travel card) while on official military orders.

Three other USCG members were passengers in the Yukon: Brian Scialabba, Calvin Norris, and Daniel Deramus. None of these individuals were called to testify at the trial.

Collins was a restrained rear passenger (riding behind the front passenger) in the second vehicle involved in the collision, a 1999 Suburban owned by Candis Guillot.

At the time of the accident, Harmansky and the other USCG members were returning from an emergency Coast Guard search and rescue mission, and Harmansky was driving the rented Yukon northbound on Louisiana Highway 1 ("LA 1") in Port Fourchon, Louisiana. The Suburban was traveling southbound on LA 1. LA 1 is a two-lane highway with a single lane for each direction of travel.

The Suburban was company-provided transportation to bring Collins from Lafayette, Louisiana to Port Fourchon where he was scheduled to go offshore for work. Collins was employed as an offshore cook and usually worked a 28-on/14-off shift. When the Suburban left Lafayette, Rodney Martin was driving the vehicle. Candis Guillot, the owner of the 1999 Suburban and Martin's then-girlfriend, was a passenger in the vehicle.

As Harmansky approached a slight right curve in the road, a disabled Acme "hot shot" truck with a trailer was stopped ahead on the right shoulder of the road and partially occupying the roadway in the lane in which Harmansky was traveling. The road

was curved in the area where the disabled truck was located. Harmansky was attempting to pass the disabled truck and trailer when the accident occurred. The disabled truck was one to two feet in Harmansky's lane of travel.

Collins was asleep when the accident occurred. Collins recalls going forward and backward due to the impact, and he surmises that he might have lost consciousness. When he came to there was glass all over the back seat and no one was in the car. Collins left the scene in an ambulance and was brought to the emergency room. Collins had glass in his eyes.

Harmansky had worked a 16 hour day when the accident occurred. Harmansky crossed over the center line into the oncoming lane of traffic when he was attempting to pass the Acme truck.

Although Harmansky testified that the truck did not have its hazard lights on, and later complained that the truck was not sufficiently pulled over to the side of LA 1, none of these factors contributed to the accident because Harmansky knew that the truck was in his lane of travel, and rather than wait until the opposite lane of traffic was clear, he decided to proceed nonetheless and crossed over the center line into the oncoming lane of traffic to avoid hitting the Acme truck. Harmansky successfully avoided hitting the Acme truck but he misjudged how long he would have to travel in the opposite lane of travel in order to successfully avoid hitting it. In taking steps to avoid hitting the Acme truck, Harmansky caused the collision with the Suburban.

The disabled truck had its hazard flashers on when the accident occurred.

The front driver's side of the Yukon and the front driver's side of the Suburban made impact.

The heavily-damaged Suburban came to rest in its own lane of travel. The accident was not caused by the Suburban being over the center line into Harmansky's lane of travel.

The road was newly-paved with the centerline clearly visible.

Trooper Mark Charpentier was on duty that night and responded at the scene, arriving at 3:01 a.m.

Charpentier observed gouge marks in the pavement which generally will indicate where the impact occurred. In this case, the gouge marks were located in the southbound lane of travel, which was the Suburban's lane of travel.

There was no evidence of impairment by anyone at the scene.

Harmansky told Trooper Charpentier that he had misjudged the length of the trailer. Harmansky saw the Suburban approaching in the opposite lane but he also misjudged how fast the Suburban was approaching him. Harmansky assumed that the Suburban would pull over to avoid hitting him since he was driving in the Suburban's lane in order to avoid making contact with the disabled truck.

Candis Guillot was called as a witness by the defense. Guillot claimed that Rodney Martin had been drinking beers at their residence in Belle Chase, Louisiana when he received the call to pick Collins up to drive him to Port Fourchon. Guillot did not recall where they picked Collins up.

Guillot told Trooper Charpentier that she had been driving the vehicle when the accident occurred but she later claimed that Rodney had been driving. Guillot could not plausibly explain why she would have lied to the trooper on the scene or whether Rodney or anyone else had asked her to lie. The trio in the Suburban stopped once

along the way at a convenience store. It is unclear whether Guillot and Martin swapped driving positions at that stop.

Guillot's testimony was unreliable and unconvincing for various reasons. The Court gives little weight to Guillot's testimony.

Trooper Charpentier's investigation was thorough and appropriate under the circumstances.

Collins was not at fault for the collision. Whether Collins had been drinking prior to the accident on April 14, 2021 is not relevant to determining fault. That said, Collins was not impaired when the accident occurred and at no time was he operating the vehicle.

The defense's theory is that Martin was actually driving and Guillot lied about being the driver because Martin had been drinking and could not risk receiving a DWI. Even if Martin was driving when the accident occurred and was under some level of influence due to alcohol consumption (the level of impairment, if any, is the subject of complete speculation), the accident occurred because Harmansky crossed the center line into the path of the Suburban after misjudging the length of the Acme truck, and he assumed that any oncoming traffic would yield to him. There is no evidence to suggest that the driver of the Suburban, whoever that might have been and whatever that individual's level of impairment might be, contributed to causing the accident.

Alcohol did not play a role in the accident.

Harmansky was not driving in a careful, prudent manner when the accident occurred. Harmansky was 100% at fault for the accident. There is no bona fide dispute as to liability.

Collins did not sustain permanent injury to his eyes as a result of the accident.

Collins suffered from neck and back pain as a result of the accident. Collins's subjective reports of pain were credible.

Collins received conservative post-accident care from LA Health Solutions beginning a little over a month after the accident.

Collins continued to experience cervical and lumbar pain so on September 29, 2021, he consulted with Dr. Marco Rodriguez, an orthopedic spine surgeon and interventional pain management specialist.

Cervical and lumbar MRIs revealed cervical herniations at C2-3, C3-4, C4-5, C5-6, and C6-7 and a bulging disk at L4-5.

Dr. Rodriguez recommended proceeding with medial branch blocks (MBB) for diagnostic purposes, and if adequate short-term relief was attained, proceeding with rhizotomies at the same levels.

On November 24, 2021, Dr. Ronald Segura performed the recommended MBB on the left side (L4/5 & L5/S1 levels).

When Collins met with Dr. Rodriguez's assistant on December 7, 2021, he reported that he had temporarily experienced 100% immediate relief from the procedure before the pain returned. He continued to experience neck pain.

In 2022 Collins was continuing to experience neck and back pain. It was not until February 14, 2023 that Collins underwent left cervical MBBs (C5/6, C6/7, C7/T1 levels). He later reported that this procedure provided relief for one day.

On February 17, 2023, Collins underwent a lumbar medical branch nerve rhizotomy or radio frequency ablation (RFA) on the right side (L4, L5, & S1 levels).

Collins later reported that the procedure provided excellent relief but that it only lasted for about 6 weeks.

An RFA is a pain-producing procedure. It is a temporary solution but not a cure because the treated nerves are expected to grow back and resume causing pain.

On May 22, 2023, Collins reported to Dr. Rodriguez that he had neck pain sometimes and low back pain all of the time.

On November 3, 2023, Dr. Segura performed cervical rhizotomies on the right side (C5, C6, C7, & T1 levels).

On December 19, 2023, Dr. Chadwick Murphy performed cervical rhizotomies on the left side (C5/6, C6/7, C7/T1 levels).

As of March 26, 2024, Collins reported that the cervical RFAs continued to provide him with complete relief from his neck pain but Collins continued to experience lumbar pain. The lumbar pain continued through 2024. On December 6, 2024, Dr. Segura administered an epidural steroid injection (ESI) at the L4-5 level (bilateral). Since that injection Collins' lumbar pain has mostly subsided.

In the winter and spring of 2025 Collins reported that since his injections his neck and back pain were manageable. But future injections may be necessary if the pain returns.

By May 30, 2025, Collins reported that his neck pain had returned since the cervical RFAs. His lower back and leg symptoms had returned since the lumbar ESI. On November 11, 2025, Collins was seen by Dr. Rodriguez, and due to the returning pain the doctor recommended repeat RFAs for the cervical pain and a repeat ESI for the lumbar pain, given the prior success of these procedures, all of which provide temporary

relief only.

On March 27, 2026, Dr. Segura performed a repeat lumbar ESI (bilateral L4, L5).

On April 10, 2026, Dr. Segura performed a repeat left cervical rhizotomy (C5, C6, C7, & T1).

Collins had significant gaps in his post-accident medical treatment which he attributed to his offshore work schedule.

Collins did have similar musculoskeletal complaints in the past but he was asymptomatic and without pain prior to April 14, 2021. Collins' current back and neck issues are the result of the accident with Harmansky. Dr. Rodriguez credibly opined that Collins's recurring pain was caused by the April 14, 2021 accident.

Collins incurred past medical expenses of $64,244.69.

It is possible and even likely that Collins's neck and back pain will return at some point. Repeat RFAs may be necessary for recurring neck pain. Repeat ESIs may be required to treat lumbar pain.

Dr. Kevin Watson conducted a brief medical examination of Collins at the request of the defense. Dr. Watson opined that Collins would not require any future medical treatment. Dr. Watson's opinions were contrary to the opinions of Dr. Rodriguez. But Dr. Watson is not a spine surgeon or interventional pain management physician and he did not treat Collins as a patient. The Court found Dr. Rodriguez's opinions regarding past medical treatment, their relationship to the April 14, 2021 accident, and the potential for necessary future medical treatment to be most credible.

Lifecare planner Dr. Aaron Wolfson testified on behalf of Collins. Using Dr. Rodriguez's opinions regarding potentially necessary future medical treatment, Dr.

Wolfson provided a total projected cost of a lifecare plan for Collins of $329,811.64 on the low end and $828,305 on the high end. These numbers were based on the worst case scenario of Mr. Collins not remaining asymptomatic, in other words his pain returning in perpetuity, for the remainder of his life (perhaps every 12-18 months), whereas so long as Collins remains asymptomatic, no treatment would be needed. The treatment outlined in the lifecare plan, which again is grounded on Dr. Rodriguez's medical opinions, is based on future subjective complaints of pain that may or may not materialize.

During his past medical treatment Collins went far longer than 12-18 months between repeat RFAs.

## II. CONCLUSIONS OF LAW

The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1346(b). Venue is proper in this district and is not contested.

Collins filed a timely administrative tort claim and exhausted his administrative remedies under the FTCA prior to filing this civil action.

Harmansky was acting within the course and scope of his federal employment with the USCG on April 14, 2021, when the accident occurred.

Louisiana law applies to the incident in this case.

Louisiana courts have adopted a duty-risk analysis in determining whether to impose liability under the general negligence principles of Civil Code article 2315.[1] *James v. Landry*, 417 So. 3d 666, 672–73 (La. App. 1st Cir. 2025). For liability to attach

[1] "Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." La. Civ. Code art. 2315(A).

under a duty-risk analysis, a plaintiff must prove five separate elements: (1) the defendant had a duty to conform his or her conduct to a specific standard of care (the duty element); (2) the defendant failed to conform his conduct to the appropriate standard of care (the breach of duty element); (3) the defendant's substandard conduct was a cause in fact of the plaintiff's injuries (the cause in fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of protection element); and (5) actual damages (the damage element). *Id.* (citing *Pinsonneault v. Merchants & Farmers Bank & Trust Co.*, 816 So. 2d 270, 275-76 (La. 2002)).

A motorist has a duty to keep his vehicle under proper control and to maintain a proper lookout for hazards, which by the use of ordinary care and observation one should be able to see. Johnson, H. Alston, La. Civ. Law Treatise Civil Jury Ins. § 4:1 (3d ed. 2011).

A motorist shall not move his vehicle from the designated line of traffic until he has first ascertained that such movement can be made with safety. La. R.S. §§ 32:78(B) & 79(1). No vehicle shall cross the painted continuous centerline of any multiple lane highway, except for the purpose of making a turn. La. R.S. § 32:82(B).

When a vehicle on the wrong side of the road collides with another car which is in its correct lane of travel, there is a presumption that the driver on the wrong side of the road was negligent. Johnson, H. Alston, La. Civ. Law Treatise Civil Jury Ins. § 4:18 (3d ed. 2011).

Harmansky breached the motorist duties imposed by Louisiana law.

Harmansky’s breach was the cause in fact and legal cause of Collins’s injuries.

Collins sustained actual damages as a result of Harmansky's substandard conduct.

Collins is entitled to receive his past medical expenses of $64,244.69.

Collins has proven that an award for future medical treatment is appropriate because accident-related pain is more likely than not to recur. The Court finds that $75,000.00 is an appropriate award for future medical expenses, which shall cover any future ESIs, RFAs, therapeutic modalities, office visits, etc.

The Court finds that $350,000.00 is an appropriate award for past and future pain and suffering.

Ace American Insurance Co. (ACE), the insurer for Enterprise Rental Car Co., was liable for the first $100,000.00 pursuant to its contract with the United States. ACE previously settled this matter and tendered its $100,000.00. The United States receives a credit for the $100,000.00 tendered, and can only be liable for any amount that is in excess of $100,000.00.

Post-judgment interest will be calculated in accordance with 28 U.S.C. § 1961 from the date of entry of judgment until paid. Costs are owed in accordance with the applicable federal rule.

August 25, 2026

Judge Jay C. Zainey
United States District Judge